THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* LUIS AVILÉS RODRÍGUEZ, Defendant and Appellant.

No. CR-66-298.    Decided September 21, 1967.

*M. Martínez Umpierre* for appellant. *J. B. Fernández Badillo, Solicitor General,* and *Irene Curbelo, Assistant Solicitor General,* for The People.

MR. JUSTICE BELAVAL delivered the opinion of the Court.

Section 203 of the Penal Code of Puerto Rico considers involuntary manslaughter the unlawful killing of a human being without malice, which occurs in the commission of an unlawful act, not amounting to felony or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection. On the other hand, § 5-101 of Act No. 141 of July 20, 1960, considers it unlawful to drive a vehicle in the rural zone at a speed greater than forty-five miles an hour and provides that the speed of motor vehicles shall be regulated taking into account the width, volume of traffic, use, and condition of the highway and prescribes that no person shall drive a vehicle at a speed greater than that which would enable him to have proper control of the vehicle, and to slow down or stop whenever necessary to avoid an accident. This accident occurs at kilometer 88.5 on highway No. 2 of Puerto Rico, known as the military road, a wide and level highway between the town of Camuy and Hatillo, a light traffic zone during nighttime, generally used for a quite moderate automobile and tractor traffic, outside the heavy traffic area produced by the proximity to the capital of Puerto Rico, of which latter fact we take judicial notice.

The evidence shows that at the time the unfortunate accident occurred, the traffic was light, the road was dry, no vehicles were traveling in the opposite direction, no lights impairing the visibility. The only two indications of possible lack of prudence or circumspection hinted at in the incriminatory evidence are the following: (1) excessive speed and (2) having failed to take into consideration that in the same direction in which the vehicle was traveling, two brothers, one younger than the other, were traveling, near the edge of the road but within the right-hand sidewalk for pedestrians.

The three persons involved in the incriminatory evidence are the brothers, Juan Crespo Vargas, Félix Crespo Vargas,

and Rafael Crespo Vargas. On arriving at the bridge which divides Camuy from Hatillo the automobile ran out of gasoline, and then Juan Crespo Vargas sent his two brothers, Félix and Rafael, for gasoline; that they went for gasoline a few minutes after eight and a little later, about 8:10 a dark blue 1955-model Chevrolet passed by, which apparently was traveling from Camuy to Hatillo, that is, in the same direction of the brothers who went for gasoline; that said automobile was traveling at about seventy miles an hour. Félix Crespo Vargas, the surviving brother of the two who went for gasoline, testified that he did not notice the speed of the Chevrolet because he was traveling with his back to the car.

On the contrary, defendant Luis Avilés Rodríguez testifies that he was traveling at 30 or 35 miles an hour, with his wife and his three children asleep in the rear seat of the automobile and his young daughter and his little son awake on the front seat. The incriminatory evidence sought to establish that defendant had proceeded on his way without stopping, but defendant testifies that he stopped and saw only one of the two men, who seemed to be dead, which point is corroborated by witness Juan A. Estrella, Lieutenant of the Police Force of Hatillo, who testified that while he was in Hatillo "Avilés arrived very excited; [he said] that he had had an accident on the road . . . that before reaching the Camuy bridge the automobile he was driving had run over two persons, and that he thought one of them was dead." The Lieutenant continues testifying that defendant's automobile had a dent on the right front side "but on the hood, not on the fenders." When Lieutenant Estrella arrived at the site of the accident he saw the same scene that defendant had described, one brother was dead and the other was hurt. Defendant testifies that when he stopped he did not see the other brother.

The inference that defendant had proceeded on his way without stopping is made in view of the fact that there were no tire marks left of the braking at the site of the accident. Defendant explains that there were no marks because he was driving slowly, he had his foot on the brakes "but it happened so suddenly that I applied the brakes and stopped." That he stopped for a moment because he saw only one man, a dead man, and as his children were asleep in the car, he decided to go to police headquarters. Lieutenant Estrella corroborates that when defendant arrived at police headquarters he told him that he had his family in the car. Félix, the surviving brother, testified that when the car hit them "it hit him first [Rafael, the deceased] and then the body of Rafael hit me. I was thrown to the road walk and he was thrown at a distance of about thirty feet . . . [and the witness was] half-dazed . . ." that he went crawling to his brother because he could not walk, he had wounds "on his legs and here, on the brain."

As to the manner in which the accident occurred Félix Crespo Vargas, the surviving brother, testifies: that when the automobile hit the body of his brother Rafael, they could not see the oncoming automobile because there was a small curve, that walking on the right-hand side, from west to east (from Quebradillas to Hatillo), "my brother [Rafael, the deceased] was walking on my left, on the edge" nearer to the road than the witness; that the witness told him to change to the right, that when his brother Rafael changed to the right "then the car hit us . . . . He [Rafael] first and then with his body he hit me, I was thrown to the walk and he was thrown at a distance of about thirty feet." On cross-examination by the attorney for the defense as to the reason why witness Félix ordered the deceased Rafael to change places, the former answers:

"Q. You said you had told your brother to change places.

A. Yes.

Q. Why did you tell it to him? What was your reason?

A. Because he was on this side and so that he would not suffer an accident I told him to change to this side.

Q. Did you fear, then, that he would suffer an accident?

A. Yes, sir.

Q. Where were you coming from?

A. From Quebradillas. From my cousin's wedding.

Q. At what time did the wedding start, where all your relatives were?

A. About 4:30.

Attorney: And it was 8:00 when this occurred. Did you take some drinks at the wedding?

A. Not we. I cannot drink.

Q. But did the others have drinks there, at the wedding?

A. Yes.

Q. Did they have drinks?

A. Yes.

Attorney: That is all, Your Honor."

Agripino Rodríguez, witness for the defense, who, because he had to leave Puerto Rico, left a deposition, testified that about 8:00 p.m., May 2, 1964, on passing kilometer 88.5 of Highway No. 2, he saw two young men traveling on the pavement of the road "with their arms around each other" and pushing each other, "arm-in-arm"; that such fact attracted his attention because "when one is driving one thinks something may happen"; that the young men were traveling on the witness' left-hand side because they seemed to be coming from Aguadilla to Arecibo; that he went on because the right lane was clear and the witness was going towards Aguadilla; that he went on to his house and when he was already there, on the porch, about fifteen or twenty minutes later some persons passed by the road saying that a young man had been killed farther on from the Camuy bridge; that the witness went in his truck to see the accident and he saw the deceased, the same person he had seen about five minutes

before the accident, when he was going arm-in-arm with the other and pushing each other on the road; that when he saw them with their arms around each other this attracted his attention because they were acting riskily "because they were jumping and pushing each other on the road."

Defendant testified that he had seen those two persons who were traveling on the pavement of the road; that when he saw them he sounded the horn and put his foot on the brakes and swerved toward the white line; that when he had his foot on the brakes the one who was walking on the outside pushed the other to the center of the road; that "then" —at that moment—he applied the brakes, but it was already too late; he struck him with the car suddenly, he could do nothing else, when the one traveling on the outside (Rafael, the deceased) pushed the other (Félix, the witness); that "when he pushed him they held on to each other; first he pushed him and then held him. But it was already too late"; that the one who was pushed got hold of the other and apparently the one on the outside got hold of him; that he has been driving trailers for nineteen years and has never had an accident.

This is an unfortunate accident where it cannot be said with reasonable serenity of conscience that defendant acted without the due prudence and circumspection prescribed by the statute. Prudence and circumspection are not synonyms of prediction or infallibility. It is contrary to the general experience of paternal foresight that a vehicle driver with three children asleep in the rear seat and two other children and his wife in the front seat would drive an automobile at seventy miles an hour in the nighttime. There is a set of circumstantial evidence, that the older brother who accompanied him as well as the sugarcane hauling truck driver who passes near the two brothers, realize, that an accident may occur to the younger brother, because the brothers holding each other by the arm were engaged in a dangerous frisk.

The laws of physics which govern the movement of falling bodies usually produce the most torturing cabalistic designs in the loom of adversity. Hence, they are not trustworthy to the trier's conscience. Following the analytic method previously employed in the case of *People* v. *Pérez*, 79 P.R.R. 460, 465–467 (1956), and *People* v. *Ortiz*, 86 P.R.R. 431, 441–442 (Santana Becerra) (1962), we conclude that the judgment rendered by the Superior Court of Puerto Rico, Arecibo Part, on October 2, 1964 in criminal case M64-157 should be reversed.

Mr. Chief Justice Negrón Fernández did not participate herein. Mr. Justice Pérez Pimentel and Mr. Justice Blanco Lugo dissented. Mr. Justice Rigau did not participate herein.